**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHAUNCY MARTIN,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 5:25-CV-2429<br><br>JUDGE JOHN R. ADAMS<br>UNITED STATES DISTRICT JUDGE<br><br>MAGISTRATE JUDGE<br>JENNIFER DOWDELL ARMSTRONG<br><br>**REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Chauncy Martin's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). Mr. Martin seeks judicial review of that decision, as it relates to SSI, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Nov. 10, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

In July 2020, Mr. Martin applied to the Social Security Administration (SSA) seeking a period of disability, DIB benefits, and SSI benefits. (*See* Tr. 184.)[1] He claimed that he became disabled on August 20, 2019. (*See id.*)[2]

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 793"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 3651").

[2] A later application for benefits, which was denied at the initial and reconsideration levels, was consolidated with this application upon remand. This procedural history is discussed further below.

He identified ten allegedly disabling conditions: (1) fibromyalgia; (2) eczema; (3) psoriasis; (4) "gastro parsis"; (5) anxiety; (6) depression; (7) post-traumatic stress disorder; (8) sleep apnea; (9) high blood pressure; and (10) "cholesterol." (Tr. 211.)

The SSA denied Mr. Martin's application initially and upon reconsideration. (Tr. 99, 106, 108, 114, 942, 956–57, 978, 982.) The ALJ held a hearing on February 14, 2021, at which Mr. Martin was represented by counsel. (Tr. 39–71.) Mr. Martin testified, as did an independent vocational expert (VE). (*Id.*)

On March 28, 2025, the ALJ issued a written decision finding that Mr. Martin was not disabled. (Tr. 14–31.)

Mr. Martin ultimately filed an appeal to this Court, and after briefing I issued a report and recommendation recommending that the Court vacate the Commissioner's decision and remand for further proceedings. (Tr. 905–34); *see also Martin v. Comm'r of Soc. Sec.*, Case No. 5:22-cv-1679-JRA, 2023 WL 4868788 (N.D. Ohio July 11, 2023). In relevant part, I rejected Mr. Martin's argument that the ALJ had failed to comply with SSR 16-3p and found that substantial evidence supported the ALJ's conclusion that Mr. Martin's subjective complaints were inconsistent with the record. (Tr. 928–33); *see also Martin*, 2023 WL 4868788, at *13–15. But I agreed that the ALJ's conclusions with respect to Listing 12.04 and the Paragraph B criteria were inconsistent with certain psychological opinions, without adequate explanation. (*See* Tr. 919 – 24); *see also Martin*, 2023 WL 4868788, at *8–10.

On July 31, 2023, the Court adopted my recommendation, reversed the Commissioner's decision, and remanded the matter for further proceedings. (Tr. 935–36); *Martin v. Comm'r of Soc. Sec.*, Case No. 5:22-cv-1679-JRA, 2023 WL 4867595 (N.D. Ohio July 31, 2026).

The ALJ held a second hearing on April 30, 2024. (Tr. 808–38.) Mr. Martin again testified, represented by counsel, and a second independent vocational expert testified as well. (*Id.*)

On March 27, 2025, the ALJ held a third hearing. (Tr. 839–80.) Mr. Martin, represented by counsel, testified, as did an independent vocational expert and a medical expert. (*Id.*)

On July 11, 2025, the ALJ issued another written decision finding that Mr. Martin was not disabled. (Tr. 777–807.)

Mr. Martin did not file exceptions with the SSA Appeals Council, so the ALJ's decision became the Commissioner's final decision in the matter.

On November 10, 2025, Mr. Martin filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Martin raises a single assignment of error for review:

> The ALJ did not properly evaluate the intensity and persistence of Mr. Martin's symptoms pursuant to SSR 16-3p and 20 C.F.R. 404.1529 and did not consider Mr. Martin's ability to sustain work pursuant to SSR 96-8p.

(Pl.'s Merit Br. at 14, ECF No. 8, PageID# 3651.)

## III. BACKGROUND[3]

### A. <u>Previous Application for Benefits</u>

Mr. Martin previously applied for DIB and SSI in September 2017, alleging disability beginning on June 1, 2013. (*See* Tr. 75.) An ALJ issued a written decision denying the claim in August 2019. (Tr. 72.) In relevant part, the ALJ found severe impairments of bipolar disorder, anxiety disorder, depressive disorder, and intermittent explosive disorder. (Tr. 77.) The ALJ found a mild limitation in the ability to understand, remember, or apply information; a marked limitation

[3] Mr. Martin explicitly confines his assignment of error to his mental health impairments and related limitations. (*See* Pl.'s Merits Br. at 5, ECF No. 8, PageID# 3642.) Thus, although I have reviewed the entire record, I focus my summary on the evidence related to Mr. Martin's mental health impairments and related limitations.

in the ability to interact with others; a moderate limitation in the ability to concentrate, persist, or maintain pace; and a moderate limitation in the ability to adapt or manage himself. (Tr. 78–79.)

The ALJ nevertheless found that Mr. Martin retained the functional capacity to perform medium-exertion work with additional limitations to simple, routine tasks; simple, work-related decisions; occasional interaction with supervisors, coworkers, and the general public; and few changes in a routine work setting. (Tr. 79.)

### B. Personal, Educational, and Vocational Experience

Mr. Martin was born in February 1982 and was 38 years old on the date of his application. (Tr. 184.) He graduated from high school. (Tr. 212.) He has experience with remote work at a call center, on an assembly line, and as an order puller for a pet supply company, to 2014. (Tr. 212–13; 81–82.) He attempted work at a cheese processing facility in 2023, but he was only able to work for two months. (Tr. 81.) He does not have a driver's license, and he has never had one. (Tr. 82, 223.)

Mr. Martin is married but has been separated from his spouse since March 2020. (Tr. 185.)

### C. Function Reports

On September 9, 2020, Mr. Martin filled out a function report in support of his disability application. (Tr. 220–27.) On a typical day, Mr. Martin will watch television, eat, and take care of his children with help from his mother. (Tr. 221.) But his mother "does about everything" to care for the children, including feeding them and tending to them. (*Id.*) He is able to prepare frozen meals, and he does so daily. (Tr. 222.) He does laundry and irons clothing, although doing so takes him a while because he is "not very motivated." (*Id.*) He cannot do house or yard work because he cannot bend for long periods. (*Id.*)

Mr. Martin wrote that he does not sleep much and sometimes needs reminders to see to his personal care tasks and to take medicine. (Tr. 221–22.) He is able to go out alone, and he is able to

ride in a car or use public transportation. (Tr. 223.) He shops at the store for food, but not often. (*Id.*) He is able to pay bills, count change, handle a savings account, and use checks. (*Id.*)

Mr. Martin enjoys watching movies, but he finds that he has trouble paying attention because his "attention span is short." (Tr. 224.) He watches and talks with his family often, and he attends church services. (*Id.*) He is "not very social." (*Id.*) He gets along with authority figures, as long as he feels respected. (Tr. 225.) But he lost his last job because he could not get along with other people. (*Id.*) He does not like to be around people. (Tr. 226.)

Mr. Martin wrote that he has a "bad memory" and can only lift about 50 pounds. (Tr. 225.) He can pay attention for "maybe 20 minutes" at a time. (*Id.*) He does not follow spoken instructions well, and he finds that he needs to read written instructions a few times before he is able to follow them. (*Id.*) He does not handle stress or changes in routine well. (Tr. 226.)

### D. <u>Relevant Hearing Testimony</u>

#### *1. Mr. Martin's Testimony*

Mr. Martin testified at the first hearing that the main reasons that he cannot work are his psoriasis and eczema. (Tr. 49.) He stated that these skin conditions have occurred since childhood. (*Id.*) He testified that when these conditions flare, he "can[not] function as a normal person would" and cannot stop scratching himself. (*Id.*) The skin conditions result in pus and bleeding. (*Id.*) Mr. Martin testified that he does "numerous things" to treat these conditions. (Tr. 50.) However, when his condition flares, he reported that he has no option but to go to the emergency room and receive steroids for "heal[ing] up" and reducing inflammation. (Tr. 50–51.) His last visit to the emergency room was approximately three months prior to the first hearing. (Tr. 51.)

Mr. Martin testified that he received steroids from his primary care provider, which are effective in "heal[ing] it up." (*Id.*) He said that it varies how long his skin stays healed between flare ups. (*See id.*) In addition to steroids, Mr. Martin was prescribed Dupixent. (*Id.*) He testified

that, at the time of the hearing, it had been eight months since he last used Dupixent due to issues with his insurance "snatch[ing] it away," and—when the medication was reapproved—the specialty pharmacist did not send it to him. (*See* Tr. 51–52.) However, Mr. Martin testified that the medication was "working fairly well" during the three months he used it. (Tr. 52.) He also stated that his skin conditions cause him to lose sleep. (*Id.*) He described his experience with his skin conditions as "having a real bad case of poison ivy that just won't let up." (*Id.*)

Mr. Martin testified that he recently started experiencing seizures. (*Id.*) At the time of the hearing, he reported having three seizures since December 2020. (Tr. 53.) He takes one and a half tablets of oxcarbazepine twice a day and Depakote to suppress his seizures. (Tr. 54.) Mr. Martin testified that so far these medications have been helping. (*Id.*)

Mr. Martin also testified that he has bipolar depression, which had been "real bad" since his wife left him. (Tr. 55.) As a result, Mr. Martin stated that he could not do the things he needed to do, such as washing his clothes. (Tr. 55.) He stated that he is "just down all the time." (*Id.*) As treatment for Mr. Martin's bipolar depression, his psychiatrist prescribed Rexulti, Depakote, Wellbutrin, and Xanax. (*Id.*) Although Mr. Martin takes these medications, he stated that "they only help so much" and "it's just the situation that . . . gets [him] down." (*Id.*)

Mr. Martin testified that he has some continuing issues with his clavicle fracture. (Tr. 58.) Specifically, he states that his discomfort "depends on the weather." (Tr. 64.) He said that sometimes his clavicle will hurt a "little," but he has not experienced any real issues outside a little discomfort and pain. (*Id.*) He testified that he limits the activities that he does with his right arm. (Tr. 64.)

Mr. Martin also testified that he has issues with irritability. (Tr. 64–65.) He stated that he has mood problems and takes mood stabilizers. (Tr. 65.) However, ever since his wife left him,

Mr. Martin stated that he "get[s] irritable quite bad." (*Id.*) He testified that his mood problems at times become an issue in getting along with others, but he apologizes to them "whenever [he] snap[s] out of it." (*Id.*) Whether his mood is an issue depends on the occasion and how moody he becomes. (*Id.*)

Mr. Martin testified that he has problems with anxiety and with focus and concentration. (*Id.*) At the time of the hearing, Mr. Martin was taking Adderall to address the concentration issues, but the Adderall does not work all the time. (*See id.*) He testified that he is able to remember to take his medications on his own "for the most part." (*Id.*)

Mr. Martin estimated that approximately four days a week, he is so down that he is really not able to do anything around the house. (Tr. 66.) He testified that he does not have any side effects from his medications. (*Id.*)

Mr. Martin testified at the second hearing that he was living with his seventy-year-old mother, and he helps to care for her. (Tr. 815–16.) He tried to work at a cheese processing facility in 2023, but he could not keep up with the other employees and started experiencing panic symptoms, so he could not return to work. (*Id.*)

After further describing the history of his physical impairments and skin conditions, Mr. Martin testified further about his mental health symptoms. Specifically, Mr. Martin said that he had been trying to avoid stressful situations. (Tr. 822.) He was treating with a counselor and was in the process of finding a new psychiatrist due to issues getting to his previous doctor. (Tr. 822–23.) Around five days per month, he feels depressed and does not leave his room or eat. (Tr. 823.) Sometimes he finds that he plans to do two loads of laundry but only gets through one because of things "running through his mind" that make it "too much" for him to "make it." (Tr. 823–24.)

Mr. Martin testified that he was being treated for depression, anxiety, and PTSD. (Tr. 824.) He has difficulty falling asleep and staying asleep. (*Id.*) Sometimes he gets four hours, other days he only gets two hours of sleep. (*Id.*) He has nightmares daily. (*Id.*) His skin conditions make him anxious and uncomfortable around other people. (Tr. 827.)

Mr. Martin finds other people "nasty" and hard to deal with. (*Id.*) He goes to church, but he does not socialize with other congregants socially. (*Id.*) Sometimes a person from church will drive him to the services or to the doctor. (*Id.*)

Mr. Martin has crying spells and experiences mood changes due to his depression. (Tr. 830.)

Mr. Martin testified at the third hearing that his anxiety symptoms include feeling fearful, especially around people he does not know. (Tr. 848–49.) He sometimes feels chest pain from stress and takes anxiety medication to "calm[] it down." (Tr. 849.) He experiences this chest tightness when he is on the bus, which is daily, and otherwise about two or three times a week. (*Id.*) He described himself as a "feather in the wind"; he is moving and shaking all the time. (*Id.*) Mr. Martin testified that he could not work for the cheese processing facility because he could not keep up, could not breathe, and could not stop sweating from anxiety. (*Id.*)

Mr. Martin testified that his depression symptoms include feeling down, feeling "good for nothing," and feeling that people would be better off if he were not here. (Tr. 851.) He has thought about suicide, but he is afraid for religious reasons. (*Id.*) He finds it hard to focus and concentrate, and he said the "past finds a way to dwell on [him]." (Tr. 851–52.)

Mr. Martin testified that he was hospitalized in October 2024, after a new doctor starting "dabbling with [his] medications." (Tr. 852–53.) He is currently seeing a counselor and a psychiatrist. (*Id.*) He avoids interacting with people he does not know. (Tr. 853.) His mood can be

alright sometimes, but that seems to be short-lived before he starts feeling down or angry again. (Tr. 858.) He has mood swings and racing thoughts. (Tr. 858–59.)

### *2. Medical Expert's Testimony*

David Peterson, M.D., testified as an independent medical expert at the third hearing. (Tr. 859.) Dr. Peterson testified that he had read the case file and heard Mr. Martin's testimony. (Tr. 860.) Dr. Peterson opened his testimony by recommending a complete psychological testing consultative examination, but then he offered to give his opinion based on his review. (*Id.*)

After reviewing the record evidence, Dr. Peterson opined that severe conditions appear to be bipolar I disorder and generalized anxiety disorder. (Tr. 864.) He opined that these conditions, singly or when combined, do not meet or medically equal a listing under the record as currently constituted. (*Id.*) He further explained that Mr. Martin had no limitation in the area of understanding, remembering, and applying information; a "mild to moderate" limitation in the area of interacting with others, specifically excluding the period of decompensation leading to his 2024 hospitalization; no impairment in the area of concentrating, persisting, or maintaining pace; and a moderate limitation in the area of adapting and managing himself. (Tr. 864–65.)

Dr. Peterson interpreted the records related to Mr. Martin's 2024 hospitalization as "decompensation," which would have been a breakthrough symptom in light of Mr. Martin's documented compliance with his medication. (Tr. 866–67.) Dr. Peterson said it was clear from the record that Mr. Martin's symptoms "wax[ed] and wan[ed]." (Tr. 868.) Dr. Peterson testified that the objective examinations referenced in the record, the GAD-7 and PHQ-9, are used for diagnostic purposes; practitioners look at different clinical data, including clinical observations, mental status examinations, and reports of function, to assess functional abilities. (Tr. 870.)

### *3. Vocational Expert's Testimony*

Deborah Lee testified as a vocational expert (VE) at the third hearing. (Tr. 872.) She classified Mr. Martin's past relevant work at the cheese processing facility as that of a conveyor feeder off-bearer (DOT 921.686-014). (Tr. 873.)

The ALJ asked the VE to assume that a hypothetical individual with Mr. Martin's age, education, and work experience had the capacity to perform work at the light exertional level, with additional limitations. (Tr. 874.) Specifically, the person can frequently handle and finger or operate hand controls with the bilateral upper extremities. (*Id.*) They can frequently operate foot controls with the bilateral lower extremities. (*Id.*) They can never climb ladders, ropes, or scaffolds and must avoid all exposure to workplace hazards like unprotected heights, moving mechanical parts, or commercial driving. (*Id.*) They are limited to performing simple, routine tasks, and they can make simple workplace decisions with only occasional interaction with supervisors, coworkers, and the general public. (*Id.*) They are limited to only occasional changes in a routine work setting. (*Id.*)

The VE testified that such a person could not perform Mr. Martin's past relevant work but could perform the work of a housekeeping cleaner (DOT 323.687-014), inspector/hand packager (DOT 559.687-074), or laundry folder (DOT 369.687-018). (Tr. 874–75.)

The ALJ next asked the VE to assume that the hypothetical individual could have no interaction with the general public. (Tr. 875.) The VE confirmed that all three identified jobs would remain available to such a person. (*Id.*)

The VE testified that 20 percent or more time off task is work-preclusive. (*Id.*)

Mr. Martin's counsel asked the VE to imagine that the hypothetical person from the first hypothetical question also had to alternate between sitting and standing at will. (Tr. 876–77.) The

VE testified that such a limitation would preclude the three jobs she previously identified. (Tr. 877.) The VE testified that one absence per month on an ongoing basis would be work-preclusive. (Tr. 878.)

### E. State Agency Consultants

A disability examiner (Jacqueline Ward), a physician (Leon Hughes, M.D.), and a psychologist (Akanksha Dutt, Psy.D.) reviewed Mr. Martin's claim at the initial review level in September 2020. (Tr. 99.)

Dr. Hughes reviewed the record and agreed with the prior ALJ's decision that Mr. Martin could perform medium work, except that Mr. Martin was limited to frequent operation of foot and hand controls and frequent handling and fingering. (Tr. 105.)

Dr. Dutt opined that Mr. Martin had a mild limitation in understanding, remembering, or applying information; moderate limitations in interacting with others and concentrating, persisting, or maintaining pace; and a marked limitation in adapting or managing himself. (Tr. 103.) Dr. Dutt explained that Mr. Martin experiences periods of low to high levels of depression and anxiety, which can reasonably be expected to affect his social interactions, ability to focus, and ability to deal with stressors. (*Id.*) Dr. Dutt noted that Mr. Martin is in treatment for these psychiatric concerns and experiences periods of improvement, and that his symptoms are also impacted by situational factors. (*Id.*) Although the diagnoses listed by Mr. Martin's providers have varied, Dr. Dutt stated that Mr. Martin's mental status abnormalities "have consistently supported the MDI established at the time of the ALJ decision." (*Id.*) Thus, Dr. Dutt stated that her findings are "an adoption of the PRTF findings from the ALJ/AC decision dated 08/06/2019 based on [Acquiescence Ruling] 98-4." (*Id.*)

Dr. Dutt also opined that Mr. Martin had the residual functional capacity to perform simple, routine tasks and make simple, work-related decisions; is limited to occasional interactions with

supervisors, coworkers, and the general public; and can tolerate few changes in a routine work setting. (Tr. 105.) She noted that this RFC finding was an adoption of the ALJ's mental RFC finding from a previous decision, pursuant to Acquiescence Ruling 98-4. (*Id.*)

Based in part on these opinions, the consultants concluded that Mr. Martin could perform the work of a cleaner, cook helper, or dietary aide and was not disabled. (Tr. 106.)

At the reconsideration level, these findings were reviewed by a different disability examiner (Tauan Jeffrey), physician (Lynne Torello, M.D.), and psychologist (David Dietz, Ph.D.) in December 2020. (Tr. 108.)

Dr. Torello agreed with and reached the same findings as at the initial level. (Tr. 113.)

Dr. Dietz opined that Mr. Martin had a mild limitation in understanding, remembering, or applying information; a marked limitation in interacting with others; and moderate limitations in concentrating, persisting, or maintaining pace and adapting or managing oneself. (Tr. 111.) Dr. Dietz also stated that his finding is "an adoption of the PRTF findings from the ALJ/AC decision dated 08/06/2019 based on [Acquiescence Ruling] 98-4." (*Id.*) With respect to Mr. Martin's RFC, Dr. Dietz said he was making no changes to the initial level findings. (*Id.*) Dr. Dietz stated that his RFC finding was "an adoption of the ALJ MRFC signed, which is being adopted under [Acquiescence Ruling 98-4]." (Tr. 113.)

Based on these opinions, the consultants agreed with the initial level findings that work was available to Mr. Martin and that he was not disabled. (Tr. 114.)

A subsequent application from Mr. Martin, which was eventually consolidated with the previous application after the remand, was reviewed at the initial level in March 2023. (Tr. 942.)

Mehr Siddiqui, M.D., opined that there was a change in the relevant musculoskeletal listings, and he opined on different physical limitations in the physical RFC. (Tr. 951–53.)

Ellen Rozenfeld, Psy.D., opined that Mr. Martin had a mild or moderate limitation in understanding, remembering, or applying information and moderate limitations in interacting with others, adapting and managing himself, and concentrating, persisting, and maintaining pace. (Tr. 948–49.) She adopted the mental RFC from 2019, opining that Mr. Martin could perform simple, routine tasks and make simple workplace decisions; he can interact occasionally with supervisors, coworkers, and the general public; and he can adapt to occasional changes in the routine work setting. (Tr. 954–56.)

Based on these opinions, the consultants determined that Mr. Martin could perform the work of a hot stone setter, assembler, or buckle-wire inserter and was not disabled. (Tr. 956–57.)

The initial-level findings were affirmed at the reconsideration level in July 2023, by Stacy Flowers, Ph.D., and Steve McKee, M.D. (Tr. 978, 982.)

### F. Relevant Medical Evidence

On August 16, 2019, Mr. Martin saw Robert Parsons, CNP, and stated that he had had some difficulties since the last visit, including that he had been denied disability benefits. (Tr. 351.) He reported a severely depressed mood, moderate anxiety, poor focus and concentration, and poor energy and motivation. (*Id.*) He said he was worried about being able to stay on task with some classes he was planning on taking. (*Id.*) But he denied racing thoughts and irritability. (*Id.*) On examination, his mood was moderately depressed. (Tr. 352.)

On August 21, 2019, and September 11, 2019, Mr. Martin saw Peter Botti, LISWS, for counseling. (Tr. 562, 564.)

On October 17, 2019, Mr. Martin saw Mr. Parsons and reported that his mood had been stable and moderately depressed since the last appointment. (Tr. 348.) But he had been more irritable, and he had been "short-tempered" with his children. (*Id.*) He was sleeping six to eight hours per night, and he did not complain of racing thoughts or report episodes of mania. (*Id.*) He

reported isolating himself at home. (*Id.*) He presented with a depressed affect and irritable mood. (Tr. 348.)

Mr. Martin had counseling sessions with Mr. Botti in October and November 2019. (Tr. 558, 560.)

On December 12, 2019, Mr. Martin saw Mr. Parsons and reported mild anxiety and moderate depression. (Tr. 343.) His medication had been working well to stabilize his mood. (*Id.*) There had been no recent panic attacks, and he was sleeping seven to eight hours per night. (*Id.*) He presented with a depressed mood. (Tr. 344.)

On February 7, 2020, Mr. Martin saw Mr. Parsons and reported that his condition was stable, with a mildly depressed mood and moderate anxiety. (Tr. 339.) He presented with a depressed mood. (Tr. 340.)

On March 25, 2020, Mr. Martin told Mr. Parsons that he had been having difficulties the last two months after his wife left him. (Tr. 335.) He reported severely depressed mood and severe anxiety. (*Id.*) The mental status examination documented a moderately depressed mood and a depressed affect. (Tr. 336.)

On April 20, 2020, Mr. Martin reported high anxiety and depression to his counselor. (Tr. 556.) He returned for counseling on May 5, 2020. (Tr. 554.)

On May 20, 2020, Mr. Martin reported a moderately depressed mood and moderate anxiety. (Tr. 331.) The mental status examination noted a depressed mood. (Tr. 332.) Medications were changed. (Tr. 333.)

Mr. Martin continued meeting with his counselor in June and July 2020. (Tr. 552, 550, 548, 546.)

On July 15, 2020, Mr. Martin reported to Mr. Parsons a stable mood and being moderately depressed. (Tr. 327.) He was in the process of trying to get a divorce. (*Id.*) He did not complain of racing thoughts or report mania episodes. (*Id.*) He was returning to school in two weeks and asked to be restarted on Adderall. (*Id.*) On examination, Mr. Martin was restless, talkative, and anxious, but was casually groomed, made good eye contact, and had normal speech, logical thoughts, good memory and concentration, and fair insight/judgment. (Tr. 328.) No changes were made to the medications, which included divalproex sodium, brexpiprazole, trazodone, bupropion, dextroamphetamine/amphetamine, and alprazolam. (Tr. 329.)

On September 8, 2020, Mr. Martin's counselor noted that Mr. Martin was "staring" at his phone and would not really engage during the session. (Tr. 544.)

On September 9, 2020, Mr. Martin again met with Mr. Parsons. (Tr. 540.) Mr. Parsons noted that Mr. Martin had "made progress" since his last visit and had "started back to school." (*Id.*) Mr. Martin reported that Adderall helped with his focus and concentration, his mood had been "stable and mildly depressed," and his anxiety had been "mild in severity." (*Id.*) Mr. Parsons's examination revealed that Mr. Martin's mood was anxious and that Mr. Martin was restless and talkative, but his thoughts were logical, his memory was good, and his concentration, insight, and judgment were all fair. (Tr. 541.)

Mr. Martin reported trouble with sleeping, focus, and racing thoughts at a counseling appointment on October 5, 2020. (Tr. 538.)

Mr. Martin met with Mr. Parsons again on October 12, 2020. (Tr. 534.) He reported severe depression, moderate to severe anxiety, irritability, and racing thoughts. (*Id.*) He said that he had only been sleeping three to four hours per night. (*Id.*) His mental status examination findings

remained the same, including an anxious mood but good memory, insight, and judgment, and fair concentration. (Tr. 535.) Mr. Parsons adjusted Mr. Martin's medications. (Tr. 536.)

Mr. Martin had a counseling appointment on November 2, 2020. (Tr. 665.)

On November 4, 2020, Mr. Martin reported stable mood and moderate depression and anxiety. (Tr. 661.) Mr. Parsons noted that the combination of Wellbutrin, Rexulti, and Depakote had been effective, and that Trazodone at bedtime was also effective. (*Id.*) Mental status examination showed a depressed mood and fair judgment and concentration. (Tr. 662.)

On December 7, 2020, Mr. Martin reported moderate depression and mild anxiety. (Tr. 657.) Mr. Martin denied mania episodes and reported the combination of Wellbutrin, Rexulti, and Depakote was effective, and that Trazodone at bedtime was also effective. (*Id.*) Mental status examination showed an anxious mood and fair concentration. (Tr. 658.)

Mr. Martin saw Mr. Parsons on May 19, 2021, and indicated that he had been moderately depressed, had ongoing issues with insomnia and had moderate anxiety. (Tr. 1875.) On examination, he presented with an anxious mood and fair concentration and judgment. (Tr. 1876.)

On July 14, 2021, Mr. Martin saw Mr. Parsons and reported that he had been severely depressed, irritable, and had moderate to severe anxiety. (Tr. 1879.) On examination, he was found to have a depressed mood, depressed affect, and fair concentration and judgment. (Tr. 1880.)

On September 17, 2021, Mr. Martin reported to Mr. Parsons that he had moderate depression and anxiety. (Tr. 1753.) He was sleeping through the night. (*Id.*) Mr. Parsons noted that Mr. Martin presented with a depressed mood. (*Id.*)

Mr. Martin saw Mr. Parsons on October 15, 2021, and reported he had been stable—mildly depressed with worsened anxiety. (Tr. 1750.) He presented with an anxious mood. (*Id.*)

On November 12, 2011, Mr. Martin saw Mr. Parsons and said he had been doing well since the last visit, although he continued to have moderate anxiety. (Tr. 1747.) His condition was unchanged on December 10, 2021. (Tr. 1744.)

On February 9, 2022, Mr. Martin underwent a behavioral health assessment at Linda L. Peterson, LPC. (Tr. 1862.) He reported symptoms of anxiety including excessive and difficult to control anxiety and worry, restlessness, being easily fatigued, having difficulty concentrating, irritability, muscle tension, and sleep disturbance. (Tr. 1864.) He reported symptoms of panic including palpations, pounding, and accelerated heart rate, and said he does not "deal with people." (*Id.*) He reported symptoms of mania including irritable mood, elevated mood, decreased need for sleep, racing thoughts, flight of ideas, distractibility, increase in goal directed activity, and psychomotor agitation. (*Id.*) The mental status examination showed an anxious mood. (Tr. 1871.) Mr. Martin's diagnoses were updated to "Bipolar Disorder, current episode, depressed, severe;[] Generalized Anxiety Disorder and Post Traumatic Stress Disorder, chronic." (Tr. 1872.) He retained diagnoses of alcohol dependence and cannabis dependence, in remission, as well as insomnia and ADHD. (*Id.*) He was recommended to outpatient counseling. (Tr. 1873.)

On February 11, 2022, Mr. Martin saw Mr. Parsons and noted that he had had mild depression and moderate anxiety. (Tr. 1740–41.) Examination noted a depressed mood. (Tr. 1741.)

On March 1, 2022, Mr. Martin saw Mr. Parsons and stated he had been doing well but continued to have stable, moderate anxiety. (Tr. 1737–38.) Examination noted a euthymic and anxious mood. (Tr. 1738.)

His condition was unchanged as of May 3, 2022, Mr. Martin saw Mr. Parsons and noted moderate anxiety and mild depression. (Tr. 1734–35.) And it was stable through June 28, 2022, with mild depression noted. (Tr. 1732.) He was stable as of September 27, 2022 (Tr. 1729), and he

had a euthymic mood on examination at that appointment. (Tr. 1729.) He remained stable in November 2022, with mild depression. (Tr. 1726, 1757.)

In January 2023, Mr. Martin reported that he had experienced some difficulties since the last visit, explaining that his mother was having significant health issues. (Tr. 1760.) He was having moderate anxiety and uncontrolled insomnia. (*Id.*) On examination, he was anxious, depressed, and irritable. (*Id.*)

On March 14, 2023, Mr. Martin saw Mr. Parsons and stated that his sleep had been poor and his mood was stable but mildly depressed; he also had moderate anxiety. (Tr. 1902.) Mental status examination showed Mr. Martin had a depressed and anxious mood. (*Id.*)

On May 9, 2023, Mr. Martin saw Mr. Parsons and reported continued difficulties with insomnia, moderate anxiety, and mild depression. (Tr. 1905.) Mental status examination showed that Mr. Martin had a depressed and anxious mood. (*Id.*)

On June 27, 2023, Mr. Martin saw Mr. Parsons and reported that he had moderate anxiety and he had started a job. (Tr. 2304.) His mood was stable and euthymic. (*Id.*) The mental status examination showed that Mr. Martin's mood was euthymic and anxious. (*Id.*)

On August 22, 2023, Mr. Martin saw Mr. Parsons, reporting that he had been more depressed since his last visit because he and his wife had separated again. (Tr. 2307.) He had mild racing thoughts and moderate anxiety. (*Id.*) He presented with a depressed and anxious mood. (*Id.*)

Mr. Martin saw Mr. Parsons on October 17, 2023, and reported that he had lost his job, he had been more depressed, had issues with insomnia, had mild racing thoughts, and had severe anxiety. (Tr. 2310.) Examination showed a depressed and anxious mood and a thought content characterized by flight and racing thoughts. (*Id.*)

On December 12, 2023, Mr. Martin saw Mr. Parsons and stated that he his mood had been stable, moderately depressed with moderate anxiety. (Tr. 2348.) Examination findings indicated a depressed and anxious mood. (*Id.*)

On February 5, 2024, Mr. Martin underwent a comprehensive intake assessment with Brandon Covey, LPC. (Tr. 2409–17.) The mental status evaluation noted that Mr. Martin had a euthymic mood, full affect, an impairment of attention and concentration and a tangential thought process. (Tr. 2412–13.) Mr. Covey diagnosed Mr. Martin with bipolar disorder, current episode depressed, moderate and stimulant use disorder, severe, in sustained remission. (Tr. 2416.)

Mr. Martin continued seeing Mr. Covey for counseling between February and April 2024. (Tr. 2392, 2395, 2398, 2407.)

Mr. Martin was hospitalized for mental health concerns from October 22, 2024, to November 2, 2024, due to "increasing psychosis." (Tr. 2859–65.) On admission, he said he had not slept in four days and was experiencing hallucinations and delusions. (Tr. 2861.) During his stay he received medications and attended unit programing and group therapy. (*Id.*) At discharge, Mr. Martin's mood had improved and stabilized. (*Id.*) Mr. Martin was recommended to be compliant with taking his medications and with outpatient care. (Tr. 2860.) His prognosis was fair with medication and treatment compliance. (*Id.*)

After discharge, Mr. Martin continued with counseling through November 2024. (Tr. 2042, 2039, 3020, 3014, 3007, 3001, 2999, 2993, 2988.)

On June 17, 2024, Mr. Martin saw Jennifer Fusco, PMHNP-BC, and reported that he had not experienced any side effects from his medication. (Tr. 3549.) He said his focus during the day is "not great," so takes Adderall to help. (*Id.*) He takes Xanax as needed, sometimes twice a day.

(*Id.*) On examination, he presented with an anxious mood and was distractible with brief concentration, although he expressed himself clearly and articulately. (*Id.*)

The next day. Mr. Martin completed a PHQ-9 examination, the scores of which corresponded with severe depression and severe generalized anxiety disorder. (Tr. 3029–30.)

On August 8, 2024, Mr. Martin consulted with Ms. Fusco. (Tr. 3559.) On examination, he had an anxious mood, was irritable, had a tangential thought process, and was distractible. (Tr. 3561–62.)

On August 9, 2024, medical expert Robert Heidrich, Psy.D., completed a response to a set of checkbox medical interrogatories sent to him (Tr. 2833). Dr. Heidrich opined that Plaintiff had no limitations in the ability to understand, remember, and carry out simple instructions. (*Id.*) Hw wrote that there was "no indication of cognitive or functional impairments." (*Id.*) He opined that there was no limitation at all in the ability to interact appropriately with supervision, coworkers, and the public, or to respond to changes in the routine work setting. (Tr. 2834.) Dr. Heidrich identified that there were no other capabilities affected by Mr. Martin's impairments. (*Id.*) Dr. Heidrich wrote that Mr. Martin's physical impairments were primary, with mental and mood issues being secondary. (Tr. 2834.)

On September 5, 2024, Mr. Martin saw Jennifer Fusco, PMHNP-BC, for a telehealth visit. Tr. 3570.) Mental status examination revealed an anxious mood, linear and goal-directed thought process, and good judgment. (Tr. 3573.)

On October 3, 2024, Mr. Martin saw Ms. Fusco and reported difficulty managing his pain and having sleep issues, with distressing dreams. (Tr. 3564.) Examination showed an anxious mood, tangential thought process, and that he was distractible. (Tr. 3567.)

On November 6, 2024, Kevin Freeman, QMHS, administered the GAD-7 showing a score of 15, which was interpreted as a "severe" score for generalized anxiety disorder. (Tr. 2997.)

On November 12, 2024, Mr. Martin saw Ms. Fusco and reported insomnia for five days which he felt led to his hospitalization. (Tr. 3575.) Ms. Fusco noted that the mental status examination showed an anxious mood, tangential thought process, distractibility, and good insight and judgment. (Tr. 3578.)

On November 20, 2024, Mr. Martin saw Ms. Fusco and reported he was experiencing inconsistent sleep patterns, fluctuating moods, and frequent anxiety attacks. (Tr. 3581.) Examination showed an anxious mood, a linear and goal-directed thought process and distractibility. (Tr. 3584.)

On December 11, 2024, Mr. Martin saw Ms. Fusco and said he had been "coping" but reported anxiety and poor sleep. (Tr. 3586.) Examination showed an anxious mood but a linear and goal-directed thought process. (Tr. 3589.)

On December 12, 2024, Mr. Martin saw Mr. Parsons and reported that he experienced labile mood and a hospitalization after his medications were changed; when he was continued on his normal medication, his symptoms stabilized. (Tr. 3206.) He said, though, that he remained mildly depressed with moderate anxiety. (*Id.*)

On January 10, 2025, Mr. Martin saw Mr. Parsons and reported that his racing thoughts had slowed and his anxiety had decreased in severity. (Tr. 3203.) Mr. Parsons diagnosed bipolar disorder, most recent episode manic; generalized anxiety disorder; and ADHD. (Tr. 3204.)

On February 7, 2025, Mr. Martin saw Mr. Parsons. (Tr. 3200.) A mental status examination showed a happy mood and fair judgment. (Tr. 3201.)

## IV. THE ALJ'S DECISION

The ALJ determined that Mr. Martin met the insured status requirements of the Social

Security Act through June 30, 2016. (Tr. 784.) The ALJ next determined that Mr. Martin had not engaged in substantial gainful activity since the alleged onset date. (*Id.*)

The ALJ next determined that Mr. Martin had severe impairments of (1) status-post left clavicle fracture with open reduction and internal fixation; (2) seizure disorder; (3) atopic dermatitis; (4) eczema; (5) psoriasis; (6) delayed gastric emptying with weight loss; (7) bipolar disorder; (8) depressive disorder; (9) generalized anxiety disorder; (10) attention-deficit/hyperactivity disorder; (11) polysubstance abuse; and (12) intermittent explosive disorder. (*Id.*)

The ALJ further found non-severe impairments of metacarpal bone fracture, obstructive sleep apnea, hyperlipidemia, and hypertension. (*Id.*) The ALJ stated any limitations stemming from these impairments were incorporated into the residual functional capacity. (*Id.*)

The ALJ next determined that none of Mr. Martin's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Martin had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 786.) Specifically, he can frequently handle, finger, and operate hand controls with the bilateral upper extremities. (*Id.*) He can frequently reach with his left, non-dominant upper extremity. (*Id.*) He can frequently operate foot controls with his bilateral lower extremities. (*Id.*) He can never climb ladders, ropes, or scaffolds. (*Id.*) He must avoid all exposure to workplace hazards like unprotected heights, moving mechanical parts, or commercial driving. (*Id.*) He can perform simple, routine tasks and make simple workplace decisions. (*Id.*) He can interact occasionally with supervisors, coworkers, or members of the public. (*Id.*) He can adapt to occasional changes in his work setting

or routine. (*Id.*)

The ALJ found that Mr. Martin could not perform his past relevant work as a conveyor feeder-offbearer. (Tr. 792.) The ALJ concluded that Mr. Martin was 37 years old on the alleged disability onset date and had at least a high school education. (*Id.*)

The ALJ then determined that—considering Mr. Martin's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a housekeeping cleaner (DOT 323.687-014), inspector and hand packager (DOT 559.687-074), or laundry folder (DOT 369.687-018). (Tr. 792–93.)

Accordingly, the ALJ determined that Mr. Martin is not disabled. (Tr. 793.)

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. <u>Standard for Disability</u>**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

**C. <u>Analysis</u>**

In his sole assignment of error, Mr. Martin alleges that the ALJ failed to properly evaluate his subjective complaints pursuant to SSR 16-3p and 20 C.F.R. 404.1529 and, further, did not consider his ability to sustain work pursuant to SSR 96-8p.

Mr. Martin points out that the record reflects that he consistently obtained mental health treatment, including medication management and counseling, but he nevertheless continued having symptoms of depression and anxiety and, indeed, once had to be hospitalized. He points to treatment notes showing racing thoughts, tangential thoughts, and distractibility. He argues that, in light of these records, the ALJ's findings—that his condition was largely stabilized with treatment and that the balance of the evidence showed mental-status examinations consistent with an ability to perform simple tasks in a relatively stable and socially limited environment—were neither reasonable nor supported by substantial evidence.

Mr. Martin further argues against the ALJ's conclusion that Mr. Martin can sustain full-time work where treatment notes show that his symptoms result in tangential thoughts and distractibility. He says that the evidence supports a conclusion that he would be off-task and absent too frequently to sustain work.

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably

be expected to produce the individual's alleged symptoms. Id. If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id.* at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165,

171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

The Commissioner defends the ALJ's conclusions, arguing that the ALJ properly considered the relevant factors and drew conclusions that were grounded in the record. The Commissioner points out that the ALJ identified examination findings that were inconsistent with Mr. Martin's reports of disabling mental impairments. The Commissioner further points out that the ALJ considered other factors, too, for example by finding that Mr. Martin improved with effective medication treatment. The Commissioner also argues that, despite the ALJ's findings of relative stability and improvement in Mr. Martin's symptoms, the ALJ nevertheless crafted a fairly restrictive RFC.

After careful consideration, I agree with the Commissioner that the ALJ adequately considered Mr. Martin's subjective symptoms and ability to sustain work, and I am confident that the ALJ's conclusions are supported by substantial evidence.

The ALJ outlined the regulatory requirements for evaluating subjective symptoms. (Tr. 786–87.) The ALJ then described Mr. Martin's subjective statements regarding his limitations, specifically acknowledging his reports that he had difficulty concentrating, following instructions, and getting along with others. (Tr. 787.) The ALJ further acknowledged Mr. Martin's report that he had a poor ability to handle stress and changes in his routine. (*Id.*)

The ALJ then found that Mr. Martin's impairments could reasonably be expected to cause these alleged symptoms, but the ALJ concluded that his subjective statements about the extent of his limitations were not entirely consistent with the medical evidence and other record evidence.

Next, over the course of three pages, the ALJ summarized the objective medical evidence and described Mr. Martin's course of treatment, which included mental health treatment and his statements to providers about his symptoms. (Tr. 787–89.) Mr. Martin points to no inaccuracy in the ALJ's summary, and I find the summary to be thorough and materially accurate.

And earlier in the decision, the ALJ had discussed Mr. Martin's mental impairments in detail when considering the Paragraph B criteria. (Tr. 785.) In this earlier discussion, the ALJ acknowledged Mr. Martin's subjective reports and cited specific record evidence that was inconsistent with disabling limitations:

> In understanding, remembering, or applying information, the claimant has no limitation. The claimant reported that he had trouble following instructions and concentrating . . . . However, he had generally intact memory and overall cognition at exams. He was able to understand and follow medical advice. Additionally, the claimant had adequate ability to understand and apply information to handle his finances . . . .
>
> In interacting with others, the claimant has a moderate limitation. The claimant said that he had ongoing depression and anxiety attacks. However, with treatment, his condition appeared to stabilize over time. He lived with his mother and children with no indication of substantial ongoing discord in their relationships . . . . He displayed cooperative behavior at his exams and he was able to go out shopping and attend church . . . .
>
> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant reported that he had poor concentration and he appeared distractible at times, but the balance of the evidence established that he had generally intact concentration and cognition. He was able to maintain attention at his exams. Moreover, the claimant was able to manage his finances an activity that can require heightened levels of attention . . . . Finally, he was able to follow the proceedings at the hearing and answer his questions appropriately.

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant appeared to live relatively independently. He went shopping and he prepared simple meals (B3E/3, 4). Moreover, he performed various household chores, including doing laundry and ironing . . . . Additionally, he displayed adequate grooming and hygiene at exams.

(Tr. 785–86) (internal citations to the record omitted).

Returning to the ALJ's discussion of the RFC, the ALJ reasoned as follows with respect to Mr. Martin's mental impairments:

> The record showed that the claimant had depression and anxiety with poor concentration at times but otherwise normal cognition, logical thoughts, cooperative behavior, and adequate insight and judgment . . . . Additionally, the balance of the record demonstrated relatively stable mental health findings, aside from an acute episode of psychosis that did not recur . . . .
>
> . . .
>
> With treatment, his condition stabilized to a large degree. Indeed, the balance of the evidence showed that he had generally logical thoughts, intact cognition, cooperative behavior, and adequate insight and judgment, which findings are consistent with performing simple tasks in the relatively stable and socially limited environment of the residual functional capacity.

(Tr. 790–91.)

Further, in discussing the opinions of the relevant psychological consultants, the ALJ noted that the consultants largely agreed that the record showed overall normal cognition, logical thoughts, cooperative behavior, and adequate insight and judgment, supporting a conclusion that he could perform simple, routine tasks with occasional interactions with others and occasional workplace changes. (Tr. 790–91.) The ALJ accurately noted that Mr. Martin's mental status findings were largely stable, except for an acute episode of psychosis that did not recur, consistent with the consultants' conclusions, and which occurred in the context of medication changes. (*Id.*)

I find no inaccuracy in the ALJ's ultimate conclusion that Mr. Martin:

> had one episode of acute psychosis with no further such symptoms. With treatment, his condition stabilized to a large degree. Indeed, the balance of

> the evidence showed that he had generally logical thoughts, intact cognition, cooperative behavior, and adequate insight and judgment, which findings are consistent with performing simple tasks in the relatively stable and socially limited environment of the residual functional capacity.

A review of the ALJ's decision reveals that the ALJ offered discernible, valid reasons for discounting Mr. Martin's subjective symptoms. While Mr. Martin points to records that he believes supports his alleged disabling limitations, the presence of some evidence that supports a claimant's position is not, alone, a sufficient reason for a remand.

Therefore, where the ALJ adequately considered subjective symptoms and rendered a decision supported by substantial evidence, I recommend that the Court overrule Mr. Martin's assignment of error.

As there is no basis to reverse or remand in this case, I recommend that the Commissioner's decision be affirmed.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: September 22, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the

> proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).